# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

MARRIO WILLIAMS,
      Petitioner,

v.                              Case No. 5:23-cv-544-KKM-PRL

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.

_____

## ORDER

Marrio Williams, a Florida prisoner, timely[1] filed a Petition for Writ

of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Williams's conviction on November 21, 2017. (Doc. 9-2, Ex. F.) His judgment became final ninety days later, on February 19, 2018, when the time to petition the Supreme Court for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). The limitation period did not begin to run, however, because on January 12, 2018, Williams had filed a petition alleging ineffective assistance of appellate counsel. (Doc. 9-2, Ex. H.) That petition remained pending until May 31, 2018, when the appellate court declined to reconsider its denial of the petition. (*Id.*, Exs. K, M.) The limitation period began to run the next day. After 291 days of untolled time, on March 19, 2019, Williams filed a motion to correct illegal sentence under Florida Rule of Criminal Procedure 3.800(a). (*Id.*, Ex. W.) The postconviction court denied relief, and the mandate affirming the decision was issued on August 16, 2019. (*Id.*, Exs. X, AA, BB.) The clock did not restart at that point because, on June 20, 2019, Williams moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. R.) That motion remained pending—and the limitation period was tolled—until June 16, 2023, when the mandate affirming the denial of relief was entered. (*Id.*, Exs. U, V.) The limitation period resumed the next day, leaving Williams 74 days—or until August 30, 2023—to file his federal habeas petition. Williams met the deadline with one day to spare, submitting his petition on August 29, 2023. (Doc. 1.) Therefore, the petition is timely.

conviction for first-degree murder. (Doc. 1.) Having considered the petition, (*id*.), and the response in opposition, (Doc. 8), the petition is denied.[2] Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.    BACKGROUND

In the early morning hours of July 25, 2012, Williams and his co-defendants Curtis Wilson and Lawrence Vickers murdered a confidential informant (CI). The victim, Jamie Seeger, began working as a CI for the Citrus County Sheriff's Office in February 2012. (Doc. 9-2, Ex. B, at 370.) Over the next two months, Seeger participated in twenty-three controlled purchases of crack cocaine from fifteen drug dealers. (*Id.* at 334, 370.) Among those who sold crack to Seeger were Williams and Vickers. (*Id.* at 335–37, 397–400, 403.)

On June 6, 2012, Williams was arrested on a warrant for sale of cocaine and possession of cocaine with intent to sell. (*Id.* at 1541–42.) Around this time, Vickers was arrested for the same offenses. (*Id.* at 360.) Both sets of charges stemmed from their sale of crack to Seeger. (*Id.* at 351, 360, 1541.) On July 19, 2012—six days before Seeger was

---

[2] Although afforded the opportunity, Williams did not file a reply.

murdered—the prosecution provided Williams's attorney with video footage of the controlled purchase. (*Id.* at 1547–49.) That footage revealed Seeger as the CI who had bought crack from Williams. (*Id.* at 353.)

On the evening of July 24, 2012, Seeger called and texted several people to purchase crack. (*Id.* at 427, 451.) She no longer worked as a CI, having been terminated after she was "placed on probation" for grand theft. (*Id.* at 410.) Seeger eventually arranged to buy crack from Williams at a gas station in Crystal River. (*Id.* at 430–31, 605, 643.) Seeger's mother came along because she "didn't feel comfortable with [Seeger] going alone." (*Id.* at 428.) As the two drove to the gas station, Seeger received a call from "the person that she was meeting up with." (*Id.* at 430.) She told her mother that the person was "Doodu" or "Duda." (*Id.*) Williams went by the nickname "Duda." (*Id.* at 605, 643.) During the phone conversation, Williams changed the location of the sale and told Seeger to "come alone." (*Id.* at 430–32.) Seeger dropped her mother off at the gas station and drove to the new location. (*Id.* at 433–35.)

Minutes later, law enforcement received a 911 call about shots fired. (*Id.* at 485–86, 488–89.) Soon after, Seeger was found dead in the

driver's seat of her car. (*Id.* at 469–74.) She had been shot nine times in the chest. (*Id.* at 871–84.)

The ensuing investigation confirmed Williams's role in the killing. Law enforcement learned that several hours before the murder, Williams had picked up his girlfriend Angela Kinchen at her house. (*Id.* at 609.) The two drove to a Quality Inn hotel in Crystal River. (*Id.* at 611–12.) On the way there, Williams told Kinchen "about how some girl was trying to play with his life and how she had a list of names that she was going to start telling the police on and how his name was one of them." (*Id.* at 613.) Shortly after midnight, Williams checked into the hotel. (*Id.* at 684–87.) He stayed in the room with Kinchen for approximately thirty minutes before leaving. (*Id.* at 615–17.) Soon after, Kinchen fell asleep. (*Id.* at 617–18.)

Around 3:00 a.m., Kinchen awoke to a phone call from Williams. (*Id.* at 618.) He asked whether she wanted to accompany him as he drove his friend to St. Petersburg. (*Id.*) The friend was Curtis Wilson, one of Williams's co-defendants. (*Id.* at 1228.) Kinchen agreed to join the two men. (*Id.* at 619.) As they drove across the Howard Frankland bridge, Williams told Wilson, "Hey, you could throw that out now." (*Id.* at 623.)

Kinchen saw Wilson grab "something [that] was wrapped up" and "chuck[] it out the window." (*Id.*) Months later, a law enforcement diving team recovered a handgun from the bottom of Tampa Bay. (*Id.* at 731–35.) The gun matched eight shell casings found at the scene of the murder. (*Id.* at 774.)

After dropping Wilson off in St. Petersburg, Williams and Kinchen drove back to Crystal River. (*Id.* at 625–28.) On the way home, Williams asked, "Remember the chick I was telling you about before that was playing on my life and was snitching on us and stuff?" (*Id.* at 629.) Kinchen replied, "Yeah." (*Id.*) Williams said that "he had to X her off the map," and that he had paid Wilson $1,000 to kill her. (*Id.* at 629–30.) Williams later told his cellmate in the county jail that "when [] Wilson was shooting the car up, it looked like [the] Fourth of July." (*Id.* at 1394.) Williams also told the cellmate that he and Vickers were present during the murder. (*Id.* at 1393.)

Williams was charged with first-degree murder. (Doc. 9-1, Ex. A, at 92.) The prosecution initially sought the death penalty, but the trial court determined that Williams was ineligible for that punishment because he was "intellectually disabled." (Doc. 9-2, Ex. N, at 564–65.) The

case went to trial. (*Id.*, Ex. B.) Williams was found guilty as charged, and he received a mandatory sentence of life imprisonment. (*Id.* at 1869–70, 1877.) His direct appeal was unsuccessful, as were his efforts to seek postconviction relief in state court. (*Id.*, Exs. F, K, M, N, P, R, U.) This federal habeas petition followed. (Doc. 1.)

## II.    <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA

was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas

court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020)

9

(internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III.  <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Williams alleges ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show

both deficient performance by his counsel and prejudice resulting from those errors. *Id*. at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id*. at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

The second part requires showing that the deficient performance prejudiced the defense. *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable

probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability is a
probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance
claim] 'is not whether a federal court believes the state court's
determination' under the *Strickland* standard 'was incorrect but whether
that determination was unreasonable—a substantially higher
threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting
*Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal
petitioners rarely prevail on claims of ineffective assistance of counsel
because "[t]he standards created by *Strickland* and § 2254(d) are both
highly deferential, and when the two apply in tandem, review is doubly
so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   <u>ANALYSIS</u>

### A. Ground One—Denial of Motion to Compel DNA Testing

Williams argues that the trial court violated his rights to due
process and a fair trial by denying his motion to compel DNA testing of
"cigarette butts found at the scene of the murder." (Doc. 1 at 5.) Law
enforcement located three cigarette butts near the car where Seeger was

shot. (Doc. 9-2, Ex. B, at 594.) One was "six feet or so" from the car, another was "a little bit farther," and the last was approximately "25 yards" away. (*Id.* at 594–95.) Law enforcement did not test the butts for DNA. (Doc. 9-1, Ex. A, at 940.) Williams moved to compel "the State to conduct DNA testing," arguing that the results would "exonerate him from the charges." (*Id.*) The trial court denied the request, finding an "insufficient showing . . . of . . . need [for] this matter." (Doc. 9-2, Ex. A, at 1907; *see also* Doc. 9-2, Ex. B, at 6.) Williams now contends that the DNA tests could have yielded "physical evidence not matching [him]," which could in turn have "created a reasonable doubt" as to his guilt. (Doc. 1 at 5.)

This claim fails because Williams cannot show "actual prejudice" under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). "On collateral review, a federal constitutional error is harmless unless there is actual prejudice, meaning that the error had a substantial and injurious effect or influence on the jury's verdict." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012) (emphasis omitted). "To show prejudice under *Brecht*, there must be more than a reasonable possibility that the error contributed to the conviction." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th

Cir. 2010). "The *Brecht* standard reflects the view that a State is not to be put to [the] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Davis v. Ayala*, 576 U.S. 257, 268 (2015).

Williams fails to show "more than a reasonable possibility" that the outcome of his trial would have been different had the cigarette butts been tested for DNA. *Mansfield*, 679 F.3d at 1313. Williams speculates that his DNA would not have been found on the butts. (Doc. 1 at 5.) But he offers no evidence to support that assertion, and there is no indication that the butts have ever undergone any form of forensic analysis. On this record, "it is just as likely that had the [butts] been tested for DNA, the results could have inculpated [Williams]." *Berry v. Sec'y, Dep't of Corr.*, No. 1:16-cv-234-WTH-GRJ, 2018 WL 6494520, at *13 (N.D. Fla. June 13, 2018), *adopted by* 2018 WL 6487994 (N.D. Fla. Dec. 10, 2018). Regardless, Williams's "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002).

14

Even if Williams's DNA were not found on the cigarette butts, that result would not "exonerate" him. The "absence of [a defendant's] DNA on . . . items collected from [a] crime scene" does "not prove that [he] was neither the perpetrator nor present at the crime scene." *Gore v. State*, 32 So. 3d 614, 620 (Fla. 2010). That is especially true here. The cigarette butts were found on a public road several feet away from the car where Seeger was shot. (Doc. 9-2, Ex. B, at 594–95.) And nothing in the record establishes when the butts were discarded. Thus, a negative DNA result "would not demonstrate that [Williams] was not present at the scene of the crime and participating with his co-defendants in the commission of the crime[]." *Galloway v. State*, 802 So. 2d 1173, 1175 (Fla. 1st DCA 2001).

## B. Ground Two—Failure to Investigate Competency to Stand Trial

Williams argues that trial counsel was ineffective for "failing to fully investigate the issue of competency and have him evaluated before trial." (Doc. 1 at 8–9.) As noted above, the trial court concluded that Williams was ineligible for the death penalty because he was "intellectually disabled." (Doc. 9-2, Ex. N, at 564–65.) That conclusion rested on three psychological evaluations of Williams. Each diagnosed

him with "mild" intellectual disability based on, among other things, his "full scale" IQ of 62. (*Id.* at 570, 574, 585.) But one evaluation found no evidence of "any active hallucinations, delusions, obsessions, compulsions, flight of ideas, or loosening of associations." (*Id.* at 584.) Another evaluation noted that Williams's "speech [was] productive and well-articulated and even in pace and volume," and that his "stream of thought [was] relevant, sequential, and goal directed." (*Id.* at 577.) Aside from mild intellectual disability, the only mental health diagnoses were "Alcohol Use Disorder, Moderate" and "Other Specified Personality Disorder with Prominent Antisocial Features." (*Id.* at 570.)

According to Williams, counsel failed to "adequately investigate [his] mental health and failed to request a competency determination prior to trial." (*Id.*, Ex. R, at 55.) Had counsel done so, "there is [allegedly] a reasonable probability that [Williams] would have been found incompetent to proceed." (*Id.*)

The postconviction court held an evidentiary hearing on this claim. Trial counsel testified that she never had any concerns about Williams's "competency." (*Id.* at 199–200.) In her view, he "was functioning . . . not at a high level, but at a normal, maybe a little slightly less than average

16

level." (*Id.* at 201.) Counsel explained that she had "fairly extensive conversations" with Williams "about the facts of the case." (*Id.* at 202.) According to her, "[t]here was no question in [her] mind that . . . [Williams] could recite the facts of the case" and "tell [her] what he . . . recalled from his perspective." (*Id.* at 213.) Moreover, Williams "certainly understood [counsel's] role and that [she] was there for him." (*Id.*) He also "understood [the prosecutors'] role" and the "role of the judge." (*Id.*) In short, counsel "didn't really have any questions as to [Williams's] competency." (*Id.*)

The postconviction court ultimately rejected Williams's ineffective assistance claim, finding that he "failed to meet his burden" of showing either deficient performance or prejudice. (*Id.* at 136.) The court noted that "[t]hree evaluations were conducted on [Williams] by three separate doctors, and none of them found anything that raised issues of competency, only intellectual disability." (*Id.*) Moreover, counsel did not have "any concern regarding [Williams's] competency," and Williams "was able to effectively communicate with his attorneys." (*Id.* at 136–37.) According to the court, Williams "actively participated in the discussion about the facts and strategy for defense in his case." (*Id.* at 137.) The

court acknowledged Williams's "intellectual disability" but found that it "alone [was] not enough to raise concern about competency." (*Id.*) In short, "[n]othing was presented that could have demonstrated a reasonably competent attorney would have questioned [Williams's] competency to proceed." (*Id.*)

This ruling was reasonable. To show prejudice, Williams must establish that "if his trial counsel had performed as he [suggests], there is a reasonable probability that the trial judge would have determined that [he] was incompetent to stand trial." *Oats v. Singletary*, 141 F.3d 1018, 1025 (11th Cir. 1998). The test for determining competency to stand trial is "whether a criminal defendant [1] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and [2] whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

A fairminded jurist could agree that there is no reasonable probability Williams "would have been found incompetent" had counsel pursued the matter. *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 480 (11th Cir. 2012). To be sure, Williams was diagnosed with mild

intellectual disability. (Doc. 9-2, Ex. N, at 570, 574, 585.) But "in the absence of evidence that the defendant was incapable of understanding the proceedings sufficiently to assist counsel, low intelligence, mental deficiency, or signs of mental illness are insufficient to show incompetence." *United States v. Greene*, 767 F. App'x 793, 797 (11th Cir. 2019); *see also United States v. Williams*, No. 21-cr-20515, 2023 WL 3902135, at *17 (S.D. Fla. Apr. 26, 2023) ("[I]t is well settled that low intellect alone does not amount to incompetency to stand trial." (collecting cases)), *adopted by* 2023 WL 3901469 (S.D. Fla. June 8, 2023). Indeed, "[m]any courts have found defendants with a mild intellectual disability—previously classified as those with an IQ approximately between 51 and 69—to be competent to stand trial." *United States v. Lewis*, 685 F. Supp. 3d 1227, 1244 (D.N.M. 2023) (collecting cases).

Williams fails to establish that his low intelligence "caused him to be confused and to lack understanding of the proceedings under the legal standard of competence." *Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992). To the contrary, Williams "was able to effectively communicate with his attorneys" and "actively participated in the discussion about the facts and strategy for defense in his case." (Doc. 9-2,

Ex. R, at 136–37.) Thus, Williams has not met his burden of "affirmatively prov[ing] prejudice" from counsel's alleged mishandling of the competency issue. *Strickland*, 466 U.S. at 693; *see also Cox v. Sec'y, DOC*, No. 2:11-cv-439-JES-UAM, 2013 WL 4734065, at *6 (M.D. Fla. Sept. 3, 2013) (no prejudice where petitioner "presented no evidence that" he "would have been found incompetent to proceed" and "nothing in the record indicate[d] that [he] was incompetent at the time of his trial").

## C. Ground Three—Failure to Adequately Argue for Judgment of Acquittal

Williams faults trial counsel for failing to present a "legally sufficient motion for judgment of acquittal." (Doc. 1 at 12.) He vaguely asserts that counsel should have "artfully present[ed] a motion based on the facts and circumstances of the case." (*Id.*) According to Williams, counsel "did not make any argument regarding the theory of [d]efense, nor did she explain how through its witnesses the State failed to refute [his] probable innocence." (*Id.*)

The postconviction court rejected this claim, finding no "deficiency by trial counsel." (Doc. 9-2, Ex. N, at 424.) The court noted that, although Williams "attempt[ed] to argue that his trial counsel made a general barebones argument, the record show[ed] that his counsel pointed out

20

specific portions of the State's evidence that [were] insufficient [and] made arguments in support thereof." (*Id.* at 423.) Williams's "mere disagreement with the exact arguments made by trial counsel [was] not enough to show deficiency." (*Id.*) In sum, the court found that counsel "sufficiently attacked the evidence presented against [Williams] by setting forth the weaknesses in the evidence." (*Id.* at 423–24.)

The rejection of this claim was reasonable. "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (quoting *Strickland*, 466 U.S. at 689–90). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which is "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. Thus, to prevail on his ineffective assistance claim, Williams must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020).

Williams fails to meet his burden. Under Florida law, a court "should not grant a motion for judgment of acquittal unless the evidence, when viewed in a light most favorable to the State, fails to establish a prima facie case of guilt." *State v. Lee*, 230 So. 3d 886, 888 (Fla. 4th DCA 2017). Here, counsel appropriately sought a judgment of acquittal on the ground that the prosecution failed to "prove a prima fa[cie] case" of first-degree murder. (Doc. 9-2, Ex. B, at 1505.) Counsel argued that the "main evidence" against Williams came from his girlfriend Angela Kinchen. (*Id.* at 1503.) According to counsel, Kinchen's testimony lacked weight because she was "very clearly pressured into making a statement." (*Id.*) This was a reference to law enforcement's alleged threat to "take [Kinchen's] children away" unless she told the truth about the murder. (*Id.* at 1505.) Counsel also noted that "there [was] absolutely no forensic evidence to tie [] Williams to the crime," nor were there any "eyewitnesses tying him to the scene." (*Id.* at 1504.) Finally, counsel maintained that "the fact that [] Seeger and [] Williams may have been in communication that night [did] not at all mean that he was the one who perpetrated her murder." (*Id.*)

22

Williams fails to show that "the approach taken by defense counsel would not have been used by professionally competent counsel." *Butts v. GDCP Warden*, 850 F.3d 1201, 1233 (11th Cir. 2017). First, Williams claims that counsel "did not make any argument regarding the theory of [d]efense." (Doc. 1 at 12.) That is incorrect. Counsel advanced the theory that the prosecution presented insufficient evidence to tie Williams to the murder. (Doc. 9-2, Ex. B, at 1503–05.) That theory did not secure an acquittal, but it was a reasonable defense strategy. Second, Williams says that counsel failed to "explain how through its witnesses the State failed to refute [his] probable innocence." (Doc. 1 at 12.) But counsel did just that, arguing that Kinchen's testimony should be disregarded because she was "very clearly pressured into making a statement." (Doc. 9-2, Ex. B, at 1505.) Thus, a reasonable jurist could conclude that Williams failed to overcome "the strong presumption in favor of competence." *Chandler*, 218 F.3d at 1314.

## D. Ground Four—Failure to Request Instruction on Lesser Included Offense

Williams contends that trial counsel should have requested a jury instruction on the lesser included offense of "manslaughter by culpable negligence." (Doc. 1 at 14.) According to Williams, the evidence

23

"established that he did not have the requisite premeditated intent to commit first-degree murder" because he "was unaware that [Wilson] was planning on killing the victim." (*Id.*) Thus, Williams contends, counsel was ineffective for "failing to request the [lesser included] instruction or objecting to the instructions as given." (*Id.*)

The postconviction court reasonably rejected this claim. (Doc. 9-2, Ex. N, at 425–26.) Florida law requires a jury to "render a true verdict according to the law and the evidence." *Sanders v. State*, 946 So. 2d 953, 958 (Fla. 2006). Thus, a jury may convict of a lesser included offense "only if it decide[s] that the main accusation has not been proved beyond a reasonable doubt." *Id.* In accord with this principle, the jury in Williams's case was instructed that if it "return[ed] a verdict of guilty, it should be for the highest offense which has been proven beyond a reasonable doubt." (Doc. 9-2, Ex. B, at 1843.) I must assume that the jury followed this instruction. *See Strickland*, 466 U.S. at 694 ("[A] court should presume . . . that the judge or jury acted according to law."). As noted above, the jury found Williams guilty of first-degree murder—a higher offense than manslaughter by culpable negligence. (Doc. 9-2, Ex. B, at 1869–70.) Therefore, "even if the lesser offense instructions had been

24

given, the jury would not have been permitted to convict [Williams] of the lesser included offense[] because it had concluded that the evidence established that he was guilty of the greater offense[]." *Crapser v. Sec'y, Dep't of Corr.*, 855 F. App'x 626, 628 (11th Cir. 2021).

Williams's claim "depends . . . on the possibility of a jury pardon—that is, that the jury would have disregarded its oath and violated its instructions by acquitting him of the greater offense and convicting him of a lesser one even though the evidence supported both crimes." *Id.* "The possibility of a jury pardon, however, cannot establish prejudice under *Strickland*." *Thornton v. Sec'y, Fla. Dep't of Corr.*, No. 3:18-cv-762-MMH-PDB, 2021 WL 2073685, at *9 (M.D. Fla. May 24, 2021); *see also Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x 888, 889 (11th Cir. 2012) ("The jury in [petitioner's] trial concluded that the evidence against him supported his conviction for the greater offenses on which it was instructed; therefore, even if the lesser offense instructions had been given, the jury would not have been permitted to convict [petitioner] of the lesser included offenses because it had concluded that the evidence established that he was guilty of the greater offenses."). Thus, the postconviction court reasonably rejected this claim.

## E. Ground Five—Failure to File "Legally Sufficient" Motion for New Trial

Williams contends that trial counsel failed to file a "legally sufficient" motion for new trial. (Doc. 1 at 15.) Counsel raised several issues in the motion for new trial, including evidentiary rulings before and during trial, the court's decision to sever Williams's trial from his co-defendants', and alleged errors in the jury instructions. (Doc. 9-2, Ex. A, at 1246–49.) The motion was denied. (*Id.* at 1252.) Williams now contends that "several of the claims" in the motion were "underdeveloped." (Doc. 1 at 15.) He offers scant details about what counsel should have said. For example, Williams complains that counsel "failed to outline how he was prejudiced by the introduction of [the victim's] hearsay statements" to her mother. (*Id.*) But Williams does not identify the statements, nor does he explain how they harmed his case. (*Id.*)

The postconviction court found that Williams "failed to satisfy either prong under *Strickland*." (Doc. 9-2, Ex. N, at 426.) The court noted that Florida law sets forth "three grounds that require the court to grant a new trial: jurors decided the verdict by lot; the verdict was contrary to law or the weight of the evidence; or new and material evidence was discovered that probably would have changed the verdict if introduced."

26

(*Id.*) The court rejected Williams's assertion that the "motion filed by trial counsel was [] barebones." (*Id.*) It noted that the motion "contained twenty-five specific errors, many of which were issues previously argued and ruled on by the [trial court]." (*Id.*) Moreover, although "the motion did include some general statements, . . . those statements [were] supported by the multitude of other specific errors set forth by trial counsel in the motion." (*Id.*) Because Williams failed to show that additional argument would have made a difference, the court found that counsel was not "ineffective for [allegedly] making a barebones motion for new trial." (*Id.*)

This ruling was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, any additional argument would not have entitled Williams to a new trial. (Doc. 9-2, Ex. N, at 426.) Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had

[counsel] done what [Williams] argues [she] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Tobitt v. Sec'y, Dep't of Corr.*, No. 8:20-cv-1841-TPB-JSS, 2023 WL 3338846, at *7 (M.D. Fla. May 10, 2023) ("By finding [petitioner's] claim 'without merit,' the state court determined that any state law motion for a new trial would have failed. This Court must defer to the state court's determination of this underlying state law question.").

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that Williams would not have prevailed on an expanded motion for new trial, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). "A lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Therefore, the postconviction court reasonably concluded that counsel was not ineffective for failing to include additional argument in the motion for new trial.

Deference aside, Williams is not entitled to relief because his assertion of ineffective assistance is conclusory. *See Wilson v. United*

28

*States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient."). Williams says that the motion for new trial was "underdeveloped," but he provides little to no detail about how counsel could have improved on the arguments in the motion. (Doc. 1 at 15.) In addition to the example quoted above, Williams complains that counsel presented a "deficient" argument when she challenged "the jury instruction informing the jury that the penalty [was] up to the judge." (*Id.* at 16.) But Williams does not explain why counsel's argument was "deficient," nor does he present any legal authority to support his contention that the instruction was erroneous. (*Id.*) "[A] district court cannot be expected to do a [habeas] petitioner's work for him."[3] *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

---

[3] Williams appears to fault counsel for failing to "preserve" certain hearsay objections for appeal. (Doc. 1 at 16.) But *Strickland* "focuses on the outcome at trial, not on appeal." *Ramos v. Dep't of Corr.*, 575 F. App'x 845, 846 (11th Cir. 2014). Indeed, *Strickland* made clear "that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal)," courts "are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal." *Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006). Accordingly, any alleged failure to preserve objections cannot support habeas relief. *See Carratelli v. Stepp*, 382 F. App'x 829, 832 (11th Cir. 2010) (where counsel raised issue but failed to "properly preserve[]" it for appeal, district court "correctly affirmed the state court

## F. Ground Six—Failure to Initiate Plea Negotiations

Williams faults trial counsel for failing to initiate plea negotiations before trial. (Doc. 1 at 18.) On the morning of trial, the court asked the parties whether they could reach "any resolution short of trial." (Doc. 9-2, Ex. B, at 14.) Defense counsel said that she had not been "approached with any possibilities." (*Id.* at 15.) After briefly conferring with her client, counsel announced that Williams "would be willing to make a five-year offer." (*Id.* at 16.) The prosecution "respectfully rejected" the offer and confirmed that it did not intend to make a counteroffer. (*Id.* at 16–17.) An hour-long recess followed during which Williams proposed a twenty-year sentence. (*Id.* at 19.) That offer was rejected as well. (*Id.*)

Williams now contends that counsel "was ineffective for failing to engage in plea negotiations with the State" before trial. (Doc. 1 at 18.) According to Williams, counsel "failed to engage in a single [pretrial] conversation" with the prosecution to "determine whether [it] was amenable to a lower sentence." (*Id.*)

---

decisions holding that the relevant prejudice inquiry should focus on trial, not the appeal").

The postconviction court rejected this claim for lack of "prejudice." (Doc. 9-2, Ex. N, at 429.) It noted that, on the morning of trial, defense counsel "made not only one, but two offers to the State, both of which were rejected." (*Id.* at 428–29.) The court acknowledged Williams's assertion that counsel should have "ma[de] a plea offer sooner," but it reiterated that "the State refused to accept any of [Williams's] offers or to make any kind of counteroffer." (*Id.* at 429.) Thus, Williams "failed to show any prejudice" from the absence of pretrial plea negotiations. (*Id.*)

This ruling was reasonable. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). "If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.* But "[i]f no plea offer is made" by the prosecution, the issue of "effective assistance of counsel in considering whether to accept [an offer] simply does not arise." *Id.* That is because "there is no constitutional right to plea bargain." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977). Thus, to show prejudice in this context, a petitioner must prove that the prosecution "offered a plea deal."

31

*Davis v. United States*, No. 20-11149, 2022 WL 402915, at *2 (11th Cir. Feb. 10, 2022); *see also United States v. Washington*, 619 F.3d 1252, 1256–57 (10th Cir. 2010) ("[T]he district court's factual finding that the government never made a firm plea offer finds adequate support in the record. Thus, [the defendant] cannot make the requisite *Strickland* showing that but for [counsel's] ineffective assistance, he would have pled guilty."); *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000) ("Logic dictates . . . that to establish . . . prejudice [from deficient advice during the plea process], the petitioner must begin by proving that a plea agreement was formally offered by the government.").

As Williams himself concedes, the prosecution "extended no plea offers" in this case. (Doc. 1 at 18.) The only offers came from Williams on the first day of trial. As noted above, the prosecution rejected Williams's five- and twenty-year offers. (Doc. 9-2, Ex. B, at 16–17, 19.) Because the prosecution made no offers and Williams had "no right to be offered a plea," he cannot show *Strickland* prejudice from counsel's alleged failure to initiate plea negotiations. *Lafler*, 566 U.S. 156, 168 (2012); *see also Johnson v. Cabana*, 818 F.2d 333, 342 (5th Cir. 1987) (holding that *Strickland* "prejudice could not have occurred" because petitioner "was

never offered a plea bargain"); *Freeman v. Inch*, No. 3:17-cv-951-LC-HTC, 2019 WL 2360895, at *4 (N.D. Fla. May 21, 2019) ("Since [petitioner] does not allege that any offer was made, either formally or informally, [he] cannot demonstrate [*Strickland* prejudice]."), *adopted by* 2019 WL 2360080 (N.D. Fla. June 4, 2019).

## G. Ground Seven—Failure to Investigate Surveillance Footage

Lastly, Williams argues that trial counsel failed to adequately investigate surveillance footage from a bank near the scene of the murder. (Doc. 1 at 19–20.) At trial, a detective testified that he had viewed the footage, which showed only the "headlights" of a vehicle around the time of the murder. (Doc. 9-2, Ex. B, at 416–17.) The detective claimed that law enforcement was unable to copy the footage "from that branch." (*Id.* at 417.) Williams now contends that counsel "should have conducted an independent investigation to attempt to retrieve the surveillance footage." (Doc. 1 at 20.) Alternatively, counsel should have "moved for a continuance" and "coordinate[d] with the State" to "view the video footage." (*Id.*)

The postconviction court held that Williams "failed to show any prejudice" because the "video provided no evidence that would have aided

in his defense or exonerate[d] him." (Doc. 9-2, Ex. N, at 429.) The court reasoned that, according to the "testimony presented at trial," the "video showed only headlights, nothing that would identify the specific vehicle in the video." (*Id.* at 429–30.)

A fairminded jurist could agree with the finding of no prejudice. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [I] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Williams]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

34

Williams fails to meet his burden. As the postconviction court noted, the surveillance footage "showed the road behind the bank with only the headlights of a vehicle, not [the] make or model." (Doc. 9-2, Ex. N, at 429.) Because no "specific vehicle" was visible, the footage had little to no evidentiary value. (*Id.* at 429–30.) On this record, "some fairminded jurists could agree" that Williams failed to show prejudice, which means that "federal habeas relief must be denied."[4] *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011).[5]

---

[4] Williams argues that counsel should have moved for either a mistrial or a new trial based on the detective's testimony about the surveillance footage. (Doc. 1 at 20.) But that footage would not have helped Williams's case, so any error was harmless and thus supplied no basis for a mistrial or a new trial. *See Heady v. State*, 215 So. 3d 164, 165–66 (Fla. 1st DCA 2017) ("A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding."); *State v. Paille*, 601 So. 2d 1321, 1323 (Fla. 2d DCA 1992) (mistrial unwarranted when "matters were either not error or were harmless error").

[5] In his petition, Williams vaguely asserts that "counsel failed to retain experts that would help explain the evidence that the State did introduce." (Doc. 1 at 20.) But Williams does not say which experts counsel should have retained, nor does he identify the "evidence" that required "expla[nation]." (*Id.*) Thus, Williams's assertion is too conclusory to warrant relief. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) (finding habeas petition "insufficient" because petitioner had "not alleged any facts to support his allegations" of ineffective assistance).

## V.    CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Williams must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Williams has not made the requisite showing. Finally, because Williams is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Williams's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Williams and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Ocala, Florida, on January 22, 2026.

Kathryn Kimball Mizelle
United States District Judge